# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DENINE CARN SCOTT,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **WEDGE RECOVERY CENTER,** | **NO.  23CV4934** |
| **Defendant.** | |

## MEMORANDUM OPINION

Plaintiff Denine Carn Scott brought this employment action against Wedge Recovery Center ("Wedge") pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*, alleging that Wedge discriminated and retaliated against her based on her asthma and gastroesophageal reflux disease ("GERD") diagnoses.  Wedge now moves for summary judgment on all claims, pursuant to Federal Rule of Civil Procedure 56.

## I.    FACTUAL BACKGROUND[1]

Wedge provides both addiction and behavioral health counseling in Philadelphia and

---

[1] Except for the following caveat, the facts recited herein are not in genuine dispute.

In Scott's Response to Wedge's Statement of Material Facts, she argues that the testimony offered by Wedge's employees during discovery should not be considered undisputed when the testimony serves Wedge and is not otherwise supported by documentary evidence.  In support of her argument, Scott cites *Waldron v. SL Indus., Inc.*, 56 F.3d 491 (3d Cir. 1995).  But in *Waldron*, the Third Circuit explicitly rejected her argument: "the Supreme Court has made it clear that self-serving testimony may be utilized by a party at summary judgment."  *Waldron*, 56 F.3d at 501 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  The *Waldron* Court applied the well-known summary judgment standard and determined that "two deponents' *competing* recollections" created a dispute of a material fact, and that therefore, summary judgment could not be granted.  *Id.* (emphasis added).  Thus, Scott's repeated citations to *Waldron*—without citing to competing evidence in the record—do not create genuine disputes; to do so, she needed to "show where in the record there exists a genuine dispute over a material fact."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex*, 477 U.S. at 322-26).  But at almost every opportunity, she declined to cite to the record, instead asserting general denials or resting her argument on her interpretation of *Waldron*.  Therefore, except as otherwise noted, Wedge's statement of the facts is taken as undisputed.

beyond, with seven centers throughout the city.  Relevant here, Wedge has three tiers of

employees.  First is the Director of Psychiatric Rehabilitation Services, who oversees the

Program Coordinators at each location.  The Program Coordinators, for their part, oversee each

location's Recovery Workers, the frontline employees who provide services to Wedge's clients.

This case arises out of Scott's employment as one of those Recovery Workers.

Throughout Scott's employment, Wedge's Personnel Policies and Procedures set forth

expectations for employee conduct.  Part of those Personnel Policies and Procedures include the

following:

### H. WORKPLACE VIOLENCE PREVENTION POLICY:

1.      The Wedge has zero tolerance for any form of violence within
the workplace.   All employees are required to complete mandatory
training, designated by the Wedge, on the identification and prevention of
violence in the workplace.

2.      Workplace violence is defined as violence, or the threat of
violence, against any employee or non-employee with whom you come
into contact in the course of your employment (regardless of when or
where the prohibited behavior occurs).  It can occur at or outside the
workplace, and can range from threats and verbal abuse to physical
assaults.  Workplace violence violations are subject to disciplinary action,
up to and including termination of employment, and may, in certain cases,
be subject to criminal prosecution.

3.      Employees experiencing workplace violence should follow the
grievance procedure set forth in this Manual.  All reasonable discretion
will be exercised to protect the victim of the violence during the
investigation.  Wedge also has a policy of non-retaliation, as set forth in
detail in the Grievance Policy set forth in this Manual.  Please also contact
local law enforcement if you feel that it is necessary to protect you or
another individual from workplace violence.

About four years after Scott suffered a lung collapse for which she spent some time in hospital and took approximately two weeks off from work. There is no dispute that she was given as much time off from work as she needed, was provided paperwork for leave pursuant to the Family and Medical Leave Act (the "FMLA") and was supplied information about short-term disability benefits.

After recovering, Scott returned to work. Upon her return, Michelle Campbell, the Director of Psychiatric Service, began receiving complaints from Diamond Hill, a member of Wedge's support staff, about working with Scott. The complaints prompted a meeting between Scott, Hill, Campbell, and Kellie Outlaw, the Program Coordinator overseeing Scott. After that meeting, Scott signed a memorandum, which detailed that the discord had been ongoing for about three weeks and that both Scott and Hill had reviewed Wedge's Personnel Policies and Procedures. Outlaw, too, made complaints to Campbell that she was having trouble working with Scott.

Approximately a year after Scott's hospital stay due to her collapsed lung, she took a day off from work for a procedure related to GERD. The next day, she returned to work. Wedge once again provided her with the pertinent FMLA and short-term disability benefit information and paperwork. Either the day of her return or the day after, Scott and Hill got into another argument. Outlaw intervened, and Scott told her to "get out of [Scott's] office" because she did not want to say "anything that [sic] to get [her] fired." Outlaw reported that Scott had said she was "on a beam right now and you know what that means in the streets," although Scott denies that she said anything to that effect.

According to Outlaw, Scott had previously told Outlaw that she owned a firearm. Based

on her knowledge and their confrontation that day, Outlaw articulated to Wedge's Human Resources Department that the disagreement had made her feel unsafe, although Scott testified that it was Outlaw, not herself, who unprofessionally escalated the conversation. Wedge's Human Resources Director, Henry Hall, investigated the incident and determined that Scott engaged in inappropriate, insubordinate, and threatening behavior, which violated Wedge's Personnel Policies and Procedures. According to Scott, Hall never told her that Outlaw had accused her of discussing her firearm; Hall was not aware of any previous reports of her discussing her firearm with coworkers. At the end of the investigation, Scott was fired, with her termination letter detailing that she was being fired "due to willful misconduct and violation of Violence in the Workplace Policy." Although Campbell and Outlaw were aware of Scott's GERD, Hall testified during a deposition that he had not known of Scott's medical conditions at the time he conducted his investigation and recommended termination.

## II.    LEGAL STANDARDS

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120

F.3d 426, 431 (3d Cir. 1997) (internal quotations omitted).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## III.    DISCUSSION

As a preliminary matter, Scott brings four claims against Wedge, but they boil down to two theories. Counts I and II allege that Wedge violated the ADA and the PHRA by discriminating against her based on her asthma and GERD diagnoses. Counts III and IV allege that Wedge retaliated against her for requesting accommodations for her medical conditions. As the parties agree, whether a discrimination or retaliation claim is brought under the ADA or PHRA is immaterial to the analysis, as the two statutes mirror one another. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141-42 & n.5 (3d Cir. 2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)); *see also Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012) (holding that the ADA and the PHRA are "to be interpreted consistently," and that both "have the same standard for determination of liability").

The parties also agree that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to Scott's discrimination and retaliation claims. *Shaner v. Synthes*, 204 F.3d 494, 500-01 (3d Cir. 2000). That framework proceeds in three steps. First, the

employee bears the burden to establish their *prima facie* case. *Jones v. Sch. Dist. Of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999). That burden "'is not onerous' and" is "'easily met.'" *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

If the employee establishes their *prima facie* case, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the" employer's actions. *McDonnell Douglas*, 411 U.S. at 802. If the employer can do so, the burden then shifts back to the employee, "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Shaner*, 204 F.3d at 500 (quoting *Jones*, 198 F.3d at 410). To carry that burden, the employee must offer "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

### A. *Prima Facie* Case: Discrimination

For a plaintiff to establish a *prima facie* discrimination claim under the ADA—thereby succeeding at the first step of the *McDonnell Douglas* framework and shifting the burden to the defendant—"a plaintiff must demonstrate: (1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment decision as a result of discrimination." *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020) (internal quotations omitted).

Therefore, the first question is whether Scott has a disability as defined by the ADA.  A review of the ADA's history is helpful context for that analysis.  "In 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA") "as a response to 'Supreme Court cases, similar lower court decisions, and the [Equal Employment Opportunity Commission's ("EEOC")] regulations' which had narrowly interpreted key provisions of the ADA."  *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 221 (3d Cir. 2024) (quoting *Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 654 (4th Cir. 2023)) (alterations in original).  Before the ADAAA, the Supreme Court construed the ADA's scope narrowly, holding that it required the plaintiff to "have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives," and that the impairment "must also be permanent or long term."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).  Congress disagreed and responded by "mandat[ing] that the 'definition of disability . . . shall be construed in favor or broad coverage of individuals' and 'to the maximum extent permitted.'"  *Morgan*, 114 F.4th at 221 (quoting 42 U.S.C. § 12102(4)(A)).

As amended, the ADA defines a "disability" in one of three ways.  A disability can be "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Although the statute's scope is now construed broadly, the statute's definitions of disability are not so broad that they encompass all impairments or conditions.  *Cf. Morgan*, 114 F.4th at 223 (reiterating that, even after the ADAAA, to qualify under the first definition of a disability, a plaintiff cannot simply identify a physical or mental impairment; the plaintiff "still must demonstrate that the resulting impairment substantially limits major life activities.").

Neither party argues the second definition; only the first and third are at play.

### i.    *The substantial-limitation definition*

To qualify under the ADA's first definition of a disability, the substantial-limitation definition, Scott must establish that her asthma or GERD substantially limits one or more of her major life activities.  42 U.S.C. § 12102(1)(A).  "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

Before the ADAAA, district courts in the Third Circuit reached different conclusions about whether asthma qualified as a disability.  *See Davis v. Davis Auto, Inc.*, 2011 WL 5902220 at *6 (E.D. Pa. Nov. 22, 2011) (collecting pre-ADAAA cases).  In some cases, the plaintiff "surmounted summary judgment on the grounds that their asthma and/or chronic health conditions substantially limit[ed] their ability to breath when they" showed "the need for 'continued vigilance to prevent debilitating attacks.'"  *Id.*  (quoting *Adams v. Pennsylvania*, 2009 WL 2707601 at *6 (M.D. Pa. Aug. 25, 2009)) (citing *Kaufmann v. GMAC Mortg. Corp.*, 2006 WL 1371185 (E.D. Pa. May 17, 2006); *Khalil v. Rohm & Haas Co.*, 2008 WL 383322 (E.D. Pa. Feb. 11, 2008)).  But in others, summary judgment was granted because "'plaintiffs allege[d] only intermittent breathing difficulties and conditions that are well controlled with medication.'" *Id.* (quoting *Anderson v. Radio One, Inc.*, 2010 WL 3719088 at *7 (E.D. Pa. Sep. 20, 2010)) (citing *Amorosi v. Molino*, 2009 WL 737338 (E.D. Pa. Mar. 19, 2009)).  The throughline of those decisions was that the inquiry into whether a plaintiff's condition qualifies as a disability is inherently fact-bound.  That understanding is reflected in post-ADAAA regulatory guidance; the substantial-limitation determination is one which "requires an individualized assessment." 29

CFR § 1630.2(j)(1)(iv).

Assuming, without deciding, that Scott's "asthma condition was a physical impairment that impacts" a major life activity (namely, breathing), *see, e.g., McAllister v. Revolutionary Home Health, Inc.*, 2023 WL 4486198 at *5 (M.D. Pa. June 9, 2023) (deciding on a motion to dismiss, that although the plaintiff's "pleadings lack[ed] specificity," she had "sufficiently pleaded that her asthma condition qualifie[d] her as a disabled person"), she points to no evidence that her asthma substantially limits her major life activities. Nor does she mention anything about any long-term impact of her two-week hospital stay prompted by her lung's collapse and how it might relate to an ongoing asthma diagnosis. Accordingly, she has failed to adduce evidence that her asthma qualifies as a disability under the ADA because Scott has not shown "where in the record there exists a genuine dispute over [the] material fact" that her asthma substantially limits her major life activities. *Cf. Doe*, 480 F.3d at 256 (citation omitted).

The same holds true for Scott's GERD diagnosis. She argues only that because of "GERD's impact on the gastroesophageal system, and the fact that Plaintiff required medical treatments to control the condition, this Court should find it qualifies as a disability." But only one instance of treatment is identified by either party in the record—Scott's procedure the day before her final altercation with Hill and Outlaw. And although being treated only once does not necessarily foreclose a conclusion that GERD is a disability, neither does one instance of treatment *establish* that it is so under the ADA. *Cf. Coleman v. Child.'s Hosp. of Phila.*, 2023 WL 7412923 at *3-4 (E.D. Pa. Nov. 8, 2023) (finding that even if the court accepted a plaintiff's improperly filed affidavit averring that, after a related procedure, she continued to suffer from gastrointestinal flare-ups, plaintiff had still not met her burden of establishing a disability at the summary judgment stage, as she had not submitted any medical records documenting such

episodes or establishing that such flare-ups impaired her major life activities).

### ii.    *The regarded-as definition*

Turning now to whether Scott—as she maintains—was "regarded as having . . . an impairment." 42 U.S.C. § 12102(1)(C). A person is regarded as having an impairment "when '. . . he or she has been subjected to an action prohibited'" by the ADA "'because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 48 (3d Cir. 2017) (quoting 42 U.S.C. § 12102(3)(A)).

A "[p]hysical or mental impairment" is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1). Although "impairments that are transitory and minor" are not actionable under the regarded-as definition of disability, 42 U.S.C § 12102(3)(B), the definition is still notably broader than the substantial-limitation definition articulated above. "[T]he definition of 'perceived impairment' . . . encompass[es] situation[s] where an employer assumes an employee has an impairment" that disqualifies the employee from a job. *EEOC v. BNSF Railway Co.*, 902 F.3d 916, 924 (9th Cir. 2018), *as amended* (Sept. 12, 2018); *cf. Rinehimer*, 292 F.3d at 381 ("[I]f for no reason whatsoever an employer regards a person as disabled—if, for example, because of a blunder in reading medical records, it imputes to him a heart condition he never had—and takes adverse action, it has violated the [ADA]" (internal quotations and citations omitted)).

Prior to the enactment of the ADAAA, the Third Circuit held that "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996); *see also Rinehimer*,

295 F.3d at 382 (holding that the "awareness that an employee is sick combined with some change in his work assignments is not enough to satisfy the 'regarded as' prong of the ADA."). And post-ADAAA, the Third Circuit has, albeit in a non-precedential opinion, indicated that mere knowledge of one instance of treatment is not sufficient to establish that an individual was "regarded as" having a disability by their employer. *Lackey*, 704 Fed. App'x at 49 (even though supervisor had witnessed one of the plaintiff's panic attacks, after which she had returned to work, that evidence was insufficient to establish that the plaintiff had been regarded as having a disability).

Although the definition is broad, Scott fails to adduce any facts that establish that she falls within its scope. Scott does not argue or point to any evidence that would establish that anyone at Wedge knew she had asthma, so there is no genuine dispute of material fact that she was not regarded as having a disability due to her asthma diagnosis. Scott does highlight that Outlaw and Campbell knew she had been diagnosed with GERD due to her taking a day off from work for her GERD-related procedure, but she fails to go the step further of establishing that their knowledge about her GERD diagnosis actually prompted anyone at Wedge to assume that the condition disqualified her from the job. *BNSF Railway Co.*, 902 F.3d at 924; *cf. Rinehimer*, 292 F.3d at 381-82.

For the reasons set forth above, Wedge's Motion for Summary Judgment shall be granted as to her discrimination claims.

## B. *Prima Facie* Case: Retaliation

"[U]nlike a general ADA discrimination claim, an ADA retaliation claim does not require that the plaintiff demonstrate a disability within the meaning of the ADA." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010). Instead, for a plaintiff to establish a *prima facie*

claim and shift the burden to the defendant under the *McDonnell Douglas* framework, "a plaintiff must show: (1) protected employee activity," such as missing work for medical treatment; "(2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997) (citations omitted).

Wedge does not dispute that Scott's time off due to her collapsed lung and GERD-related procedure are protected employee activities, and that termination would be considered an adverse action. Wedge does argue, however, that Scott has not established a causal connection between her time off and her termination.

Although a plaintiff eventually must "prove that retaliatory animus was the 'but-for' cause of the adverse employment action" to surmount the final step of the *McDonnell Douglas* framework, in order to establish a prima facie case, a plaintiff need only "produce evidence sufficient to raise the inference that her protected activity was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 258-59 (3d Cir. 2017) (internal quotation omitted) (alterations in original). The "temporal proximity" between the protected activity and adverse employment action can establish causation if that temporal proximity is "unusually suggestive." *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 221 (3d Cir. 2017) (quotation omitted). Alternately, a plaintiff can prove causation by showing "a pattern of antagonism coupled with timing" suggestive of retaliation. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). To be sure, these are not the only means available to the plaintiff, as causation is "gleaned from the record as a whole," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000), but Scott argues only that the

temporal proximity between taking a day off from work for her GERD-related procedure and her being fired suggests retaliation.

Scott does not make any argument about temporality regarding her asthma or the two weeks when she was hospitalized due to her collapsed lung. In part, that may be because her two-week hospital stay occurred approximately a year before she was fired, and therefore any "inference of 'unduly suggestive' temporal proximity" had "dissipate[d]." *Moody*, 870 F.3d at 221 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (holding that a three-month gap between adverse action and protected activity cannot create an inference of causation and defeat summary judgment). So, she has failed to establish a *prima facie* retaliation claim as it pertains to her asthma diagnosis and treatment.

She does, however, argue that because her day off for her GERD-related procedure occurred a day or two before her firing, the temporal proximity between the two events is so unusually suggestive that it gives rise to an inference of causation. The parties dispute whether Scott's firing occurred the day after her procedure or the next day thereafter, but the result is the same—such proximity in time qualifies as "unusually suggestive." See *Lichtenstein v. University of Pittsburgh Medical Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (seven days between protected activity and adverse action was unusually suggestive); *Jalil* v. *Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days).

In that Wedge does not dispute that Scott engaged in a protected employee activity when she took a day off from work for her GERD-related procedure and that firing her constituted an adverse action, and because the temporal proximity between the two events was "unusually suggestive," Scott has established a prima face case of retaliation.

### C.  Legitimate, Nondiscriminatory Reason

Because Scott has established a *prima facie* case of retaliation as to her GERD-related procedure, the burden now shifts to Wedge to "articulate some legitimate, nondiscriminatory reason" for terminating Scott.  *McDonnell Douglas*, 411 U.S. at 802.  Wedge has done so: it argues that it fired Scott due to her multiple conflicts with colleagues and after an investigation into a particular altercation with a colleague and a supervisor.  Scott does not dispute that Wedge's articulated reason for firing her is a legitimate, non-discriminatory one; she focuses the rest of her argument on the third step of the *McDonnell Douglas* framework.

### D.  Pretext

Because Wedge has articulated a legitimate, nondiscriminatory reason for firing Scott, the burden now shifts back to her to establish "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Shaner*, 204 F.3d at 500 (citing *Burdine*, 450 U.S. at 252-53).  To do so, she must provide "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764 (citations omitted).

In large part, Scott relies on her temporal proximity argument to establish pretext, asserting that the timing between her GERD-related procedure and her termination undermines Wedge's legitimate nondiscriminatory reason for terminating her.  Scott also points to the fact that both Outlaw and Campbell knew she had been treated for GERD, that Hall did not ask her if she had a gun, and that she denied making any violent statements.

Scott purports to identify other issues with Hall's investigation that show that her

termination was based on pretext, namely that Hall really did know that she had GERD and that his investigation was a sham.  But for these contentions, she offers no evidence in the record. Nevertheless, the facts for which she has adduced evidence to support, namely that she denied making any inappropriate statements to either Hill or Outlaw, and that Outlaw and Campbell, her supervisors, both knew that she had GERD, when viewed in the light most favorable to her and drawing all inferences in her favor, could cause a reasonable juror to disbelieve Wedge's articulated legitimate reasons for terminating her.  As such, Scott's claim for retaliation, predicated solely on her taking a day off from work for her GERD-related procedure, survives Wedge's Motion for Summary Judgment.

An appropriate order follows.

BY THE COURT:


*/s/ Wendy Beetlestone*

_____
**WENDY BEETLESTONE, J.**